Benefit *v.* Cambridge.

CRAIG BENEFIT *vs.* CITY OF CAMBRIDGE & others.[1]

Middlesex. April 8, 1997. - May 14, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, &
MARSHALL, JJ.

*Constitutional Law,* Freedom of speech and press. *Practice, Civil,* Declaratory proceeding, Standing.

A person who had been arrested and prosecuted under G. L. c. 272, § 66, and who demonstrated a continuing likelihood of continued prosecution under that statute, had standing to seek a declaration pursuant to G. L. c. 231A, that the criminal statute was unconstitutional. [920-922]

Where soliciting of contributions, including peaceful begging, is expressive activity protected by the First Amendment to the United States Constitution [922-923], where G. L. c. 272, § 66, imposes a criminal sanction on begging based on the content of a beggar's speech in public places [923-925], and where there was no demonstration that the statute was necessary to serve a compelling State interest [925-927], a judge in the Superior Court correctly declared that G. L. c. 272, § 66, was an overbroad and unconstitutional regulation of speech protected by the First Amendment [927].

CIVIL ACTION commenced in the Superior Court Department on July 9, 1992.

The case was heard by *Catherine A. White,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Gregory I. Massing,* Assistant Attorney General, for the District Attorney for the Northern District.

*Sarah R. Wunsch (Jonathan Shapiro* with her) for the plaintiff.

*Maria Foscarinis, Catherine Bendor, Carl Nadler & Thomas J. Perrelli,* of the District of Columbia, for National Law Center on Homelessness and Poverty, amicus curiae, submitted a brief.

---

[1]The police commissioner of Cambridge; Rudy Wolcott, a Cambridge police officer; and the district attorney for the Northern District (Middlesex County).

GREANEY, J. General Laws c. 272, § 66, provides that "[p]ersons wandering abroad and begging, or who go about from door to door or in public or private ways, areas to which the general public is invited, or in other places for the purpose of begging or to receive alms, and who are not licensed" may be imprisoned for up to six months. The plaintiff, Craig Benefit, filed a complaint on July 9, 1992, in the Superior Court seeking (1) a declaration under G. L. c. 231A, that G. L. c. 272, § 66, is unconstitutional under the First and Fourteenth Amendments to the United States Constitution, and arts. 1 and 16 of the Declaration of Rights of the Massachusetts Constitution; (2) an injunction preventing the defendants from "threatening, intimidating, harassing, arresting and prosecuting" him when he is peacefully begging in public places; and (3) damages and attorney's fees. A judge in the Superior Court considered cross motions for summary judgment and, insofar as relevant to this appeal, ordered that "a declaration enter, declaring that G. L. c. 272, § 66 is an overbroad and unconstitutional regulation of speech protected by the First Amendment to the United States Constitution and violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution," and that the defendants be preliminarily enjoined from enforcing the statute. The district attorney appealed pursuant to G. L. c. 231, § 118, second par., from the preliminary injunction that entered on the judge's orders, and we granted an application for direct appellate review. We are concerned only with the declaration quoted above and the resulting preliminary injunction.[2] We conclude that G. L. c. 272, § 66, violates the First Amendment because it bans constitutionally protected speech in traditional public forums. As a consequence, we need not consider the plaintiff's equal protection claim under the Fourteenth Amendment or the State constitutional claims.

The following material facts appear to be undisputed. The plaintiff is thirty-six years old and states that he "resides on the streets of Cambridge." He usually sleeps outside,

[2]The plaintiff's complaint was entitled "Class Action," but he has neither sought nor received class certification. The complaint's introductory paragraph also made reference to claims under 42 U.S.C. § 1983 (1994), and G. L. c. 12, § 11I. No specific claim has been made under either law in the body of the complaint, and, in any event, we are concerned in this appeal only with the declaration quoted above and the preliminary injunction.

sometimes using a tent or sleeping bag, and subsists on the money he receives from begging and on a monthly social security disability check ranging between $460 and $489.

The plaintiff frequently sits on sidewalks in Harvard Square, often in front of a CVS store located there, holding various signs that request help and refer to love, peace, food, or other messages about the United States government.[3] At times, he holds a cup into which people may deposit money. The plaintiff talks with people about the messages on his signs, and sometimes, if a passerby is willing, the plaintiff discusses his homelessness, the reasons for it, and the role of the government in dealing with the homeless. The plaintiff's activity is peaceful; he does not approach or threaten anyone either physically or verbally, and he does not block any sidewalk or any store entrance. He uses the money he receives in donations to purchase the basic necessities of life.

On March 17, and June 19, 1992, the defendant Officer Rudy Wolcott of the Cambridge police arrested the plaintiff for violating G. L. c. 272, § 66. On July 9, 1993, another Cambridge police officer arrested the plaintiff for violating G. L. c. 272, § 66, and also charged him with being a disorderly person in violation of G. L. c. 272, § 53. On October 19, 1993, the plaintiff appeared in the Cambridge Division of the District Court Department with counsel, and moved for a continuance without a finding on all four charges. He admitted to sufficient facts on each of the charges and waived his rights to a jury trial and to an appeal. The judge dealing with the charges ordered them continued without a finding until April 22, 1994, when they were dismissed. The declaration and preliminary injunction that are before us were entered on June 18 and 20, 1996.

1. The district attorney points out that the criminal charges against the plaintiff under G. L. c. 272, § 66, were disposed

---

[3]An example of one of the signs held by the plaintiff reads as follows:

"Needs Help!!

This Kindred Spirit seeks HELP!
Unemployed; *Cook  Window  Cleaner  Bicycle  Mechanic  Surfer*

Can *you* Help *PLEASE*"

of during the pendency of this civil action by the plaintiff's admissions that amounted to the functional equivalent of guilty pleas, and that the plaintiff did not challenge the constitutionality of the statute during the prosecutions. Because the criminal cases are over, the district attorney argues that no actual controversy exists, and that the plaintiff lacks standing to seek declaratory relief. We do not agree.

To obtain declaratory relief, there must be a " 'real dispute' caused by the assertion by one party of a duty, right, or other legal relation in which he has a 'definite interest,' in circumstances indicating that failure to resolve the conflict will almost inevitably lead to litigation." *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648, 659 (1980), quoting *Bunker Hill Distrib., Inc.* v. *District Attorney for the Suffolk Dist.*, 376 Mass. 142, 144 (1978). A party has the "definite interest" necessary to confer standing to challenge the constitutionality of a statute if he has suffered, or is in danger of suffering, legal harm. *Pratt* v. *Boston*, 396 Mass. 37, 42 (1985). Furthermore, the plaintiff's constitutional challenge is based on an assertion of his First Amendment rights. The United States Supreme Court has said that "[b]ecause of the sensitive nature of constitutionally protected expression, [the Court has] not required that all those subject to overbroad regulations risk prosecution to test their rights. For free expression — of transcendent value to all society, and not merely to those exercising their rights — might be the loser." *Osborne* v. *Ohio*, 495 U.S. 103, 115 n.12 (1990), quoting *Dombrowski* v. *Pfister*, 380 U.S. 479, 486 (1965).

The judge stated the following with respect to the plaintiff's standing:

> "It is undisputed that plaintiff has been arrested at least three times under the statute. He has been handcuffed, jailed, bailed, arraigned, and brought to court. In addition, plaintiff has been threatened with arrest numerous times and ordered to leave Harvard Square — all on the basis of [G. L. c. 272, § 66]. There is no dispute that the Middlesex District Attorney's Office pursued prosecutions of plaintiff on charges of violating the statute.
>
> "Defendants present no evidence that they will refrain

> from enforcing the statute against plaintiff or other
> peaceful beggars should the Court deny plaintiff stand-
> ing. Indeed, [the] First Assistant District Attorney of
> Middlesex County . . . has attested to the importance of
> enforcement of the 'vagrancy statute' as a 'tool' in crime
> prevention and for protection of its 'citizens from being
> accosted, intimidated, or harassed' " (footnote omitted).

We agree with the judge that a real dispute exists and that
the plaintiff has a sufficient personal interest in the rights and
relief at stake to meet standing requirements. The district at-
torney has not indicated that he will refrain from enforcing
G. L. c. 272, § 66, against the plaintiff. The other defendants,
who are not parties to this appeal, have not agreed to stop ar-
resting the plaintiff. There exists a continuing threat, indeed a
likelihood, of continued prosecution under G. L. c. 272, § 66.
Further, judicial efficiency would not be promoted by declin-
ing to act on this case, only to face the same issue again when
the plaintiff is rearrested. No argument put forth by the
district attorney persuades us that the plaintiff lacks standing
or that the case is otherwise inappropriate for the declaratory
and injunctive relief that was sought.

2. We conclude that (a) the peaceful begging engaged in by
the plaintiff involves communicative activity protected by the
First Amendment; (b) the criminal sanction, imposed on that
activity by G. L. c. 272, § 66, is content- and viewpoint-based
and bans the activity in traditional public forums; and (c) as a
result, the statute is subject to strict scrutiny, a test which it
cannot pass.

(a) It is beyond question that soliciting contributions is
expressive activity that is protected by the First Amendment.
In *Schaumburg* v. *Citizens for a Better Env't*, 444 U.S. 620
(1980), the United States Supreme Court struck down an
ordinance prohibiting solicitations by charitable organizations
that did not use at least seventy-five per cent of their revenues
for charitable purposes. The Court held that "charitable ap-
peals for funds, on the street or door to door, involve a vari-
ety of speech interests — communication of information, the
dissemination and propagation of views and ideas, and the
advocacy of causes — that are within the protection of the
First Amendment. . . . [S]olicitation is characteristically in-
tertwined with informative and perhaps persuasive speech

seeking support for particular causes or for particular views on . . . social issues, and . . . without solicitation the flow of such information and advocacy would likely cease." *Schaumburg, supra* at 632. See *United States* v. *Kokinda,* 497 U.S. 720, 725 (1990); *Riley* v. *National Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 788 (1988); *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U.S. 947, 961 (1984); *Loper* v. *New York City Police Dep't,* 999 F.2d 699, 704 (2d Cir. 1993).

Begging is generally defined as speech in which the person seeking assistance either asks for money or expresses need through some other clear form of communication such as a sign, a donation cup, or an outstretched hand. Many times a beggar's solicitations will be accompanied, as were the plaintiff's, by communications that convey social or political messages. "Even without particularized speech, however, the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance. We see little difference between those who solicit for organized charities and those who solicit for themselves in regard to the message conveyed. The former are communicating the needs of others while the latter are communicating their personal needs. Both solicit the charity of others. The distinction is not a significant one for First Amendment purposes." *Loper, supra* at 704. Indeed, it would be illogical to restrict the right of the individual beggar to seek assistance for himself while protecting the right of a charitable organization to solicit funds on his behalf. Such a conclusion would require citizens to organize in order to avail themselves of free speech guarantees, a requirement that contradicts the policies underlying the First Amendment. We conclude, on the strength of the charitable solicitation cases cited above, that there is no distinction of constitutional dimension between soliciting funds for oneself and for charities and therefore that peaceful begging constitutes communicative activity protected by the First Amendment.[4]

(b) General Laws c. 272, § 66, states a broad ban on beg-

---

[4]We reject the district attorney's argument that the statute is proper, based on the dicta in *Alegata* v. *Commonwealth,* 353 Mass. 287, 297-298 (1967), that refers to "the act of begging" and assumes that the act "could properly be made a criminal offence . . . [as] an annoyance which the Legislature could . . . prohibit." That statement cannot withstand current

ging that by its terms makes distinctions based on the content of the message conveyed. Under the statute, only communicative activity that asks for direct, charitable aid for the beggar constitutes a crime. The statute permits speech by those who ask in public places for money for other purposes, such as money for parking meters, change for the bus, money to make a telephone call, assistance where a wallet has been lost, donations for school teams and activities, money for all kinds of political and social causes, and money for newspapers and articles sold on the street. The conduct by the solicitor in all of these examples is the same: "wandering about" (in the parlance of the statute) in a public place, communicating with strangers, and requesting assistance of some kind. By prohibiting peaceful requests by poor people for personal financial aid, the statute directly targets the content of their communications, punishing requests by an individual for help with his or her basic human needs while shielding from government chastisement requests for help made by better-dressed people for other, less critical needs. The statute is thus necessarily content based because the content of the individual's message determines criminal guilt or innocence.

The statute may also be fairly characterized as viewpoint based because it favors the view that poor people should be helped by organized groups and should not be making public requests for their necessities. See Hershkoff & Cohen, Begging to Differ: The First Amendment and the Right to Beg, 104 Harv. L. Rev. 896, 907 (1991) ("When the government prohibits begging, it takes one position among several existing

First Amendment jurisprudence, which has held, as noted in the text, that solicitation is protected speech and that preventing an "annoyance" is not sufficient to justify interference with First Amendment rights. See *Coates* v. *Cincinnati*, 402 U.S. 611, 615-616 (1971) ("public intolerance or animosity cannot be the basis for abridgment of . . . constitutional freedoms").

We also conclude, contrary to the district attorney's argument, that the statute's prohibition against begging targets speech, not conduct. Communication is an inherent aspect of begging: a beggar's activities (sitting or walking in a public place) would be legally permissible under the statute *but for* their communicative aspects. "When the government prohibits begging, '[t]he only "conduct" ' which . . . [it seeks] to punish is the fact of communication." Hershkoff & Cohen, Begging to Differ: The First Amendment and the Right to Beg, 104 Harv. L. Rev. 896, 908 (1991), quoting *Cohen* v. *California*, 403 U.S. 15, 18 (1971).

views on charity and prohibits speech that implicitly promotes a contrary viewpoint").[5]

These types of bans are not lightly permitted. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition on public discussion of an entire topic." *Consolidated Edison Co. of N.Y.* v. *Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980). See *Turner Broadcasting Sys., Inc.* v. *FCC*, 512 U.S. 622, 643 (1994) (laws that "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based"); *R.A.V.* v. *St. Paul*, 505 U.S. 377, 382 (1992) ("[c]ontent-based regulations are presumptively invalid").

The statute directs its ban Statewide at all public places, and thus includes the public sidewalks where the plaintiff conducted his activity as well as public parks and other areas. These sites fall within the category of property traditionally held open to the public for expressive activity. Since we are concerned with a content-based prohibition on communicative activity occurring in what have historically been considered public forums, the statute must be subjected to strict scrutiny. See *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 584 (1975).

(c) It has not been shown that G. L. c. 272, § 66, is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

We reject the district attorney's argument that the statute supports the Commonwealth's compelling interest in preventing crime and in providing safe streets. There is no basis whatsoever in the record to support the assumption that those who peacefully beg are likely to commit crimes. It cannot "be seriously contended that because a person is without employ-

---

[5]The district attorney incorrectly argues that the statute is content neutral because the beggar may give speeches about poverty or homelessness and because the law also prohibits people who are neither poor nor homeless from seeking aid for themselves. The government is not permitted to restrict speech by allowing speech on a more general topic. See *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976). Furthermore, allowing a beggar to speak on political or social issues will nonetheless chill his exercise of free speech: without the possibility of a charitable donation, expression by the beggar most likely will not take place.

ment and without funds he constitutes a 'moral pestilence.' Poverty and immorality are not synonymous." *Edwards* v. *California,* 314 U.S. 160, 177 (1941). Further, the government cannot make communicative activity criminal solely on the ground that the person engaging in the activity might commit a future crime. "A presumption that people who might walk or loaf or loiter or stroll . . . or who look suspicious to the police are to become future criminals is too precarious for a rule of law. The implicit presumption in these generalized vagrancy standards — that crime is being nipped in the bud — is too extravagant to deserve extended treatment." *Papachristou* v. *Jacksonville,* 405 U.S. 156, 171 (1972). Nor are we impressed with the argument that the statute is justified because, to quote the district attorney's brief, it "create[s] an atmosphere where citizens may go about their way free from being accused, intimidated, or harassed." A listener's annoyance or offense at a particular type of communicative activity does not provide a basis for a law burdening that activity, see *Texas* v. *Johnson,* 491 U.S. 397, 408-409 (1989), especially because people are free to ignore or walk away from the beggar's request for money or attention.

We conclude that no compelling State interest has been demonstrated that would warrant punishing a beggar's peaceful communication with his or her fellow citizens in a public place.[6] As one writer on the subject has observed: "At the least, for some panhandlers, begging is a way to augment their meager sources. For a few, it may be their only source of income. Panhandling is therefore close to the center of the personal liberty of some people in contemporary American society." Munzer, Response to Ellickson on "Chronic Misconduct" in Urban Spaces: Of Panhandlers, Bench Squatters, and Day Laborers, 32 Harv. C.R.-C.L. L. Rev. 1, 11 (1997). The statute intrudes not only on the right of free communication, but it also implicates and suppresses an even broader right — the right to engage fellow human beings with the hope of receiving aid and compassion. The streets and public areas are quintessential public forums, not because they are a particularly convenient platform for expression,

---

[6]As a result of this conclusion, we need not consider whether the statute is narrowly tailored to satisfy a compelling State goal, beyond noting that, were we to deal with the issue the statute would fail the guideline stated in *Boston* v. *Back Bay Cultural Ass'n,* 418 Mass. 175, 182 (1994).

but because they are the necessary, essential public spaces that connect our individual private spaces, from which we legitimately may exclude others and likewise be excluded, but from which we almost all must inevitably emerge from time to time. If such a basic transaction as peacefully requesting or giving casual help to the needy may be forbidden in all such places, then we may belong to the government that regulates us and not the other way around.[7]

3. We assume that public officials will comply with the law once a court has defined it, and injunctions usually are not needed in the absence of intransigence on the part of such public officials. See *Hoffer* v. *Commissioner of Correction*, 397 Mass. 152, 156 (1986), and cases cited. We think that assumption is relevant here, and, when the other issues that are, or may be, raised in the complaint and answer are finally resolved, the judge may decline to enter a permanent injunction. We leave that determination to the judge in the first instance. The judge's declaration that, based on the plaintiff's activity, G. L. c. 272, § 66, violates the First Amendment to the United States Constitution, is affirmed, as is the preliminary injunction entered pursuant to that declaration.[8]

*So ordered.*

---

[7]There is ample authority available to the government to deal with beggars who transgress peaceful limits. Depending on the nature of the transgression, charges may be brought for disorderly conduct, trespass, assault, assault and battery, and other offenses that may result from peaceful activity turned aggressive. See, e.g., G. L. c. 272, § 53. But see *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 597-598 (1975) (limiting the applicability of § 53 to conduct *other* than speech).

We decline the district attorney's invitation to cure any constitutional infirmity in G. L. c. 272, § 66, through a limiting construction.

[8]The plaintiff's request for appellate attorney's fees is not appropriate for consideration at this time because no claim has been decided in the plaintiff's favor that would entitle him to such fees. The request, therefore, is denied without prejudice.